# EXHIBIT 2

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

PHILADELPHIA INDEMNITY INSURANCE COMPANY, a Pennsylvania corporation, as subrogee of DH&G, LLC,
Plaintiff,
vs.
HEWLETT-PACKARD COMPANY,
Defendant.

2:19-cv-00138-RSM

---

ZOOM VIDEO CONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

KEN RICE

---

ATTENDANCE OF ALL PARTICIPANTS VIA

ZOOM VIDEO CONFERENCE

---

9:02 a.m.

February 15, 2023

Magna Legal Services

866-624-6221

www.MagnaLS.com

REPORTED BY: Lauren G. Harty, RPR, CCR #2674



A P P E A R A N C E S

FOR PLAINTIFF: JOHN MACMILLAN
MacMillan, Scholz & Marks
900 SW 5th Avenue, Suite 1800
Portland, Oregon 97204
503.224.2165
jmacmillan@msmlegal.com

FOR DEFENDANT: CHRISTOPHER BETKE
Coughlin Betke
175 Federal Street
Boston, Massachusetts 02110
617.988.8050
cbetke@coughlinbetke.com

E X A M I N A T I O N

| ATTORNEY | PAGE |
|---|---|
| BY MR. BETKE: | 4 |

E X H I B I T I N D E X

| EX# | DESCRIPTION | PAGE |
|---|---|---|
| 1 | 12/18/2018 Jensen Hughes report. | 10 |
| 2 | 8/16/2021 Jensen Hughes report. | 11 |
| 3 | Photograph 01 01 2016 08 40. | 25 |

KEN RICE, witness herein, having been duly sworn by the Certified Court Reporter, testified upon oath as follows:

E X A M I N A T I O N

BY MR. BETKE:

Q. Mr. Rice, my name is Chris Betke, and I represent HP in this action and just going to go over a few of the ground rules here today so we're all operating under the same rules.

Couple things. First off, please answer all the questions with words like yes or no instead of head nods or hand gestures or things of that nature. That way we get a clear record. Okay?

A. Sure.

Q. If I remind you of that from time to time, I'm not trying to give you a hard time. Just want to make sure we get -- we get things clear.

If at any point in time you need to take a break to stretch, use the restroom, you know, grab a cup of coffee, anything like that, let me know. I'll be happy to accommodate you. We've worked well with Mr. MacMillan throughout this process, you know, doing our best collaboratively to get through what we have to get through. I would only ask that if -- if you

have a question pending, that you answer the question as best you can before we take the break. Fair enough?

A. Okay. Sure. Sure.

Q. And if at any point in time you do not understand a question that I ask you, there's no way for me to know what's going on in your head unless you tell me. If you tell me that you don't understand, I can either explain it or rephrase it. Fair enough?

A. Fair enough.

Q. Okay.

All right. Please state your name for the record?

A. Name is Ken Rice.

Q. And where are you currently, Mr. Rice?

A. I'm currently in Pierce County.

Q. Is that in Washington?

A. Yes, it is.

Q. Okay.

And we're here today to talk about a fire that occurred at The Bluffs apartment. Are you aware of that matter?

A. Yes, I am.

Q. And specifically, the location of the apartment was at 2 West Casino Road, Everett,



as Jensen Hughes, the assignment?
A. I believe he did give us the assignment.
Q. Yeah. If -- if -- I think if you look at your report --
MR. BETKE: And why don't we -- why don't we mark that as the first exhibit, Lauren, which is -- would be the Jensen Hughes report dated December 18, 2018.
Q. (By Mr. Betke) If you look at that, sir, you'll see that it's addressed to Ryan Johannsen. So is that consistent with your understanding that he would have been the original person to assign this to CASE?
A. Yes. At least our point of contact. I don't -- you know, when -- when the -- when the assignments came in quite often they would just have us go out and --
Q. Yeah.
A. -- it could come in through different avenues, but Ryan was the main point of contact.
Q. Okay.
How -- how many -- prior to the -- the date of -- of the assignment here, which was within a few days of -- of December 31, 2015, how many times had -- had Mr. Johannsen assigned work to CASE Forensics, to

your knowledge?
A. I wouldn't -- I don't know.
Q. Had you ever worked with him previously?
A. I don't think so. There's a possibility, but I didn't -- I don't remember that.
Q. Okay.
Now, we have a second report, and I will -- let's mark that as Exhibit No. 2, which is entitled "BLUFFS AT EVERGREEN REBUTTAL REPORT," and that's dated August 16, 2021. Do you have that handy, sir?
A. I don't have any of the reports in front of me. I thought you would be able to furnish --
Q. Yeah.
A. -- them.
Q. Okay.
MR. BETKE: So, hey, John, can you forward those to him, please?
MR. MACMILLAN: Yeah. I'll do that now.
Q. (By Mr. Betke) So if I were to say that there were two reports, sir, one dated August -- I'm sorry -- one dated December 18, 2018, and one dated August 16, 2021, would that be consistent with your recollection?
A. I believe so, yeah.
Q. All right. So why don't we give you a

second to get those. All right?
A. I'm not sure how I'm going to get those, but let's see what I can do.
Q. I think Ken is emailing -- I'm sorry -- John is emailing them to you.
While we wait for you to receive those, why don't I just ask you some questions and we'll -- you know, we'll keep it moving. And then you can let us know if they've come through. Okay?
A. Okay.
Q. Did you review your reports in preparation for today?
A. I did.
Q. Okay.
So you had them at least for purposes of reviewing them for today, correct?
A. Correct.
Q. Where are they now?
A. They'd be in my email, which I'm not able to access right now for some reason.
Q. Okay. All right.
But you -- you weren't -- you're not surprised that I'm planning to ask you about those reports today --
A. No.

Q. -- are you?
A. No. Not at all.
Q. Okay. All right.
The -- is it fair to say that when it comes to in -- this matter when it comes to opinions about the battery pack and the battery cells that you are deferring to Mr. Eskra in that regard?
A. That is correct.
Q. And so you're not -- you're not purporting to offer opinions -- scientific opinions about the battery pack and battery cells, correct?
A. Correct.
Q. All right.
When you reviewed your reports in preparation for today did you ascertain or discover that you -- or learn that you had any opinions of significance that were not included in those reports?
A. No.
Q. Okay.
Can you just state for the record what your educational background is, sir?
A. High school graduate, community college. Went through -- got my police officer certi -- certification at community college. And then outside of that several sessions at the National Fire Academy.



A. Yes.
Q. Okay.
Now I'm going to just ask you about a couple of aspects of NFPA 921 and just see if you agree or disagree with the statements. Okay? Or -- or some other answer I guess.
Do you agree that the investigation analysis of any fire-related incident is a complex scientific endeavor?
A. Would you ask that again?
Q. Yeah.
Do you agree that the investigation and analysis of any fire-related incident is a complex scientific endeavor.
A. No.
Q. Okay.
Do you believe that it's a scientific endeavor?
A. Depends on the fire.
Q. Okay. All right.
And do you believe that one should employ the scientific method when investigating a fire?
A. Yes.
Q. Do you agree with the following statement: Determination of what patterns were produced at the

point of origin by the first item ignited usually becomes more difficult as the size and duration of the fire increases. This is especially true if the compartment has achieved full room involvement?
A. Yes.
Q. In this particular fire at Oak Bluffs the Davis bedroom achieved full room involvement, didn't it?
A. Yes.
Q. And did it reach flashover?
A. Yes.
Q. All right. I'm going to read you another statement and see -- ask if you agree with it. The investigator should not assume that the fire at the origin burned the longest and therefore fire patterns showing the greatest damage must be at the area of origin. Greater damage in one place than in another may be the result of difference in thermal exposure due to differences in fuel load, the location of the fuel package in the compartment, increased ventilation, or fire-fighting tactics. Agree?
A. Agree.
Q. And some of the things the investigator is supposed to consider in making their origin determination are as follows: Witness information

and/or electronic data, correct?
A. Correct.
Q. Fire patterns, correct?
A. Correct.
Q. And fire dynamics, correct?
A. Correct.
Q. Have you ever heard of a heat and flame vector analysis technique?
A. I have.
Q. Is that discussed in NFPA 921?
A. Yes.
Q. Did you use -- did you do a heat and flame vector diagram in this case?
A. I don't recall.
Q. All right. Have you gotten your reports yet?
A. Let's see. The speed of light, right?
It says it's loading.
Q. All right.
All right. So why don't I -- I'll loop back to that one and we'll just try to keep going as best we can here.
A. I'm going to ask a question real quick. Do you --
Q. Yeah.

A. -- want me to open the -- the original report or the rebuttal?
Q. Well, what I was going to say to you -- I asked the question if you did a heat and flame vector analysis diagram, and then what I was going to ask you was if you wanted the opportunity to review your report to determine -- because you said you didn't know, so I'm going to give you a chance to determine -- look at your report to tell me if you did that.
A. Okay.
Q. You can look at either one as the case may be. Probably the first one.
MR. BETKE: While he's doing that I'm just going to go grab a quick cup of coffee, if that's okay. I'm not going to -- be right back.
I'm back.
Q. (By Mr. Betke) Mr. Rice, have you had a chance to look at that? And if you need more time, just let me know.
THE WITNESS: Oh. I'm muted.
A. I looked through it. I don't see any mention of a heat and vector analysis.
Q. (By Mr. Betke) Okay.
Is there any particular reason why you



A. Well, to be exact, are you -- like an HP notebook or just a, you know --
Q. A computer notebook, a computer notebook of any sort. Have you -- let me -- let me make it easier for you. Have you proffered any opinions -- meaning written opinions. So maybe there's something that didn't come to fruition for whatever reason. But have you ever proffered a written opinion in any matter in which you concluded that a notebook computer caused a fire.
A. It's possible, but I don't recall.
Q. Okay.
And have you -- same question, except have you ever testified in -- in a court or in a deposition in a case where you opined that a notebook caused a fire?
A. I'll have to give you the same answer. It's possible, but I don't recall.
Q. All right.
So as you sit here today you can't recall any instances where you testified or rendered opinions that a notebook caused a fire. It's possible, but you don't recall any, correct?
A. Correct.
Q. All right.

Now, have you prepared any other written reports in connection with this matter other than the two that I -- that were passed along to you and that you reviewed in preparation for your deposition?
A. No.
Q. Now, I know in Exhibit 1, which is the first report, you reference an interview that you did with Lynn. You -- do you re -- do you recall that?
A. Yes.
Q. All right.
If you'll look at page 5 of your report, just so you know what I'm referring to, it indicates --
MR. BETKE: Strike that.
Q. (By Mr. Betke) As you sit here today over seven years later do you recall that interview?
A. Yes. I mean, not to a hundred percent accuracy, but I do -- I do recall finding Lynn and chatting with her, yes.
Q. Okay.
How long did that interview last?
A. I don't know.
Q. I mean, was it ten or 15 minutes? Five minutes? An hour?
A. I would say it was less than an hour.

Q. Other than that, can you tell me how long it was?
A. I -- I would have to guess.
Q. Okay. All right.
So that's -- your best estimate is some amount of time less than an hour, correct?
A. Correct.
Q. Did you record it?
A. No.
Q. Why not?
A. I never recorded interviews.
Q. Okay.
Did you have an iPhone at the time or some sort of smart phone?
A. Correct, iPhone.
Q. Yeah.
So you could have recorded it on your iPhone, but you elected not to because you don't do that. Is that fair?
A. That's fair, yes.
Q. Okay.
And do you know where Lynn is today?
A. I believe she's deceased.
Q. All right.
And do you know when she died?

A. I don't.
Q. Do you know how she died?
A. No.
Q. Do you know whether or not she died before Philadelphia Indemnity filed a lawsuit in this case?
A. I don't.
Q. Did you have her sign a written statement in connection with your interview of her in January of 2016?
A. I did not.
Q. So -- and did you make notes of your conversation with her?
A. I did.
Q. And have you reviewed them in preparation for today's deposition?
A. I did.
Q. Okay.
How many pages are those notes?
A. I'd have to go back and look because it was notes -- and I'll -- when I start the fire investigation I'll start at a -- at the top of the page I'll write the information down about, you know, the -- the client and the information --
Q. Yeah.
A. -- about the fire. And then I just go



through and take notes as I proceed through the investigation.

Q. Okay.

But when you looked at it in preparation for today how long did it -- how long was the portion related to Lynn? Was it pages? A single page? Part of a page?

A. I'd say one to two pages.

Q. And -- you still have those, correct?

A. Correct. They're in my file.

Q. All right.

And aside from -- now, if you look at page 5 of your report, there's a bullet -- a bunch of bullet points related to your interview with her. And is there anything that you saw in preparation for today in your notes that is of significance or would be of import to this case that is not set forth in the bullet points?

A. Not to my knowledge.

Q. Okay. All right.

Did you ever talk to the public investigators in connection with this matter?

A. I did.

Q. Who did you speak to and when did you speak to them?

A. I can't tell you when. I talked to Steve Goforth, who was the Assistant Fire Marshall for Everett Fire Department.

Q. Okay.

And when did you speak -- you -- I'm sorry. Did you say you can't say when?

A. Yeah. I don't -- I don't know exactly when I spoke with him.

Q. All right.

I mean, was it like, you know, a couple of days after the fire? Two years after the fire? That kind of thing. At least can you give me an estimate?

A. There would have been several conversations. The first one was probably the day that I got to the scene and looked at the scene. And then, you know, there's always subsequent, you know, just chat, call, find out where they're at with it, that type of conversation.

Q. Okay.

So did you -- when you -- the -- the first conversation you talked to, was it pretty much about getting access to the scene and general information about the fire?

A. Yeah. There were several things. I wanted to make sure the scene was released. We had heard it

was. You always want to reach out to the public to make sure that they're done.

The second was that the duplex receptacle adjacent to the mattress had been removed, so I was really concerned about where that went, why it left, who took it, those types of things. So we got -- we had a conversation about that, and he'd indicated it was one of his investigators, Jim -- and I apologize. I don't have the last name in front of me.

Q. Okay.

A. He had taken it for evidentiary value I believe.

Q. Why -- why was it you were concerned about that, like who took it and where it was, et cetera?

A. Well, it's not a common practice to liberate those things until we have a joint exam. You know, for any large loss we would leave that stuff in place. If it's going to be secured and nobody can bother it, not much of a reason to take it. So I -- I wanted to know where it went, how it was taken, who took it, where it went. Was it, you know, copper thieves that came in in the middle of the night or what -- where did it go. It's --

Q. Yeah.

A. -- important, right?

So he had told me that his investigator had removed it and it was in the custody of Everett PD.

Q. Okay.

What -- as -- can you recall any other parts of the conversation?

A. You know, we talked about the -- the interviews, you know, with Lynn. And that was interesting because she seemed -- his opinion was she was kind of all over the page and they weren't really getting a whole picture of what happened.

Q. All right.

Did --

A. Other --

Q. -- you --

A. -- than that --

Q. Okay. Sorry.

You were going to say other than that, that's all you can remember? Is that fair?

A. Yes.

Q. Okay.

And then in subsequent conversations did you ever have, you know, substantive conversations with the public investigators about their -- their investigation versus your investigation or was it merely to check in to find out what the status of

MAGNA LEGAL SERVICES

THE WITNESS: Could I take a -- maybe a two-minute break real quick?
MR. BETKE: Hundred percent.
THE WITNESS: All right.
MR. BETKE: Let's take a break. Thank you.
(Recess.)
(Marked Deposition Exhibit Nos. 1-3.)
MR. BETKE: All right. So back on the record.
Q. (By Mr. Betke) You agree with me, sir, that the degree of damage to an appliance is not an adequate indication of origin.
A. Yes.
Q. Because -- that's true because an appliance can be damaged itself in a fire. In -- in other words, it can be significantly damaged as a result of the fire as opposed to it causing the fire, correct?
A. Correct.
Q. And in -- more so in -- in a circumstance where a product might have -- or an appliance might have a fuel load in it like a battery pack in a notebook computer, correct?
A. Correct.
Q. All right.
A. And I'll clarify my answer. There -- there

has been -- and I've had several. One comes to mind. I did have a freestanding PC and that was the only fire, like right there. So --
Q. Yeah.
A. -- it wasn't attacked by the fire.
Q. Yeah.
A. I don't know how that came up.
So there is certain circumstances where I could say that --
Q. You --
A. -- an appliance --
Q. You know, I was going to -- you know, I was going to carve that out myself because -- yeah. I mean, look. If a -- if -- I always tell the story if I took a match and I threw it in this garbage can over here and then I took -- put it out immediately and then I asked you where was the area of origin, it'd be pretty easy to say in that garbage can, right? Because --
A. Right.
Q. -- the fire is constrained and, you know, you'd have to be not too bright not to figure out that it started there. You wouldn't have to be an expert.
But with a fire certainly of this magnitude you would agree with me that you can't look at the

damage at the appliance and conclude it caused the fire. Is that fair?
A. That's fair.
MR. MACMILLAN: Object --
Q. (By Mr. Betke) All right.
MR. MACMILLAN: -- to the form.
And you can still answer, Ken. Sorry.
Q. (By Mr. Betke) Okay.
Now, did you observe electrical arcing in Mr. Davis' room?
A. That would have been Sebastian that would have looked for that.
Q. All right.
So is it fair to say that you did not play a role in arc location or analysis? Is that correct?
A. Correct.
Q. And so you would defer -- whatever they concluded, you used that and incorporated it, but that was not part -- that was not your opinion. That was their opinion. Is that fair?
A. Fair.
Q. Okay.
And so there was some -- there -- there was reference in the reports about a lamp cord and it having an arc and arc mapping. And is it fair to say

you played no role in that?
A. Correct.
Q. All right.
Do you know whether arc mapping is treated differently in NFPA 921 in the 2021 Edition versus the 2017 Edition?
A. I haven't reviewed it in depth, but my understanding is there was going to be a movement of it or it was going to be eliminated from 921.
Q. And is it -- you know, earlier I asked you about the three things one considers in connection with determining origin. They were witness statements and electronic data, fire dynamics, and -- hang on one second. You can help me out here if --
A. Fire --
Q. -- you want.
A. -- patterns.
Q. And fire patterns.
Isn't it fair to say that arc mapping used to be in that section in 2017 and it's -- and it's been crossed out? It's not part of that anymore. It's not included in the thing -- things to consider. Isn't that true?
A. That's correct.
Q. All right.



Line 22, "MS. YEVROVICH: Yeah, and he -- he never put -- he hardly ever put linens on his bed, but they would be piled all over the place. I got the impression he liked the piles of blankets and stuff because he would hide some of his bottles there."

So -- first of all, let me ask you, is that consistent with your recollection of what she said?

A. Yes.

Q. So I note that she started to say never, but then she corrected herself and said hardly ever, right?

A. Correct.

Q. And that suggests that there were times he put linens on the bed, but probably mostly not, right?

A. Yes.

Q. Okay.

So can you state for the record your basis for concluding that there were no linens on the bed at the time of this fire.

A. Based on her statements.

Q. Okay.

And is that the statement I just read or some other statement?

A. Just -- my interview with her.

Q. Okay.

So is -- is the -- so the base -- the basis that there were no linens on the bed at the time of the fire is your interview with her in the parking lot that's referenced in your report, correct?

A. Correct.

Q. All right.

And that's the interview that's not recorded, right?

A. Correct.

Q. And really because she's passed away our only source of what is or is not in that -- or what she did or did not tell you is -- are your notes, correct?

A. Correct.

Q. And regardless, it is true, isn't it, that Mr. Davis would pile linens all over the place in that room?

A. Yes.

Excuse me.

Q. And he had piles of blankets and stuff in that room too, right?

A. Yes.

Q. And as I testified earlier, he kept it as messy as he could. I'm sorry. "As I testified." Nice try, Chris. As I asked earlier, he kept that

room as messy as he could, right?

A. Yes.

Q. You would agree with me, sir, that piles of linens and blankets are a competent ignition source, aren't they?

A. No.

Q. You don't -- you don't believe that linens and blankets can be set on fire?

A. Yeah, but I don't believe that they would be the competent ignition source. The competent ignition source would be something that would ignite them.

Q. Okay. Fair enough.

A. The first fuel --

Q. That's --

A. First fuel ignited, yes.

Q. All right. You're -- you're -- you're much more -- well, this is why you're the expert and I'm not, sir.

A. Oh, okay.

Q. You're much more precise than me and I -- you know, I got to own that. Okay.

So you're -- you would agree that linens and blankets are a competent first material ignited for a fire, correct?

A. Correct.

Q. And so, you know, if Mr. Davis had a Zippo lighter and he had piles of blankets and -- and linens in his room, you're not disputing that he could have lit those on fire with a Zippo lighter, are you?

A. Are you asking me if it's possible --

Q. Yes.

A. -- to --

Q. Yes.

A. -- to light --

Q. Yes.

A. -- blankets on fire with a lighter?

Q. Yes.

A. That is possible.

Q. Okay.

Now, I want to ask you about smoking in his room. And how did you rule out smoking as a potential cause of the fire?

A. Well, there was two things that I relied on; is, one, that she had told me that he does not smoke in his room. And then, two, we didn't -- we didn't find any discarded smoking materials when we went through the room and went through the debris.

Q. Okay.

And with respect to him -- his -- her saying he didn't smoke in the room, it's fair to say that the



only source where she says he did not smoke in the room is her interview with you in the church parking lot, correct?
A. Correct.
Q. And in fact, in the recorded police interview she says a couple of different times that he did smoke in the room, correct?
A. Correct.
Q. So in order for that part of your -- of your opinion to stand we have to conclude that she told you something different than what she told the Everett Police Department, correct?
A. Correct.
Q. And you have elected to believe what she told you in that parking lot versus what she told the Everett Police Department, correct?
A. Correct, because I -- I did not find any evidence of discarded smoking material in the room.
Q. All right.
Well, I'm going to get to that in a second.
A. Okay.
Q. There's two parts of what you said. The first one -- I just -- I want to just focus in because I want to get this clear. You said there were two things. One, she told me he didn't smoke, right? And

two, I didn't find any discarded smoking materials in the room, right?
A. Correct.
Q. All right.
And so with respect to the first one, you agreed with me that she told the Everett Police and Fire Department that he did smoke in the room multiple times, right?
A. Yes.
Q. All right.
In fact, I believe she said he had been doing it for years in that room, didn't she?
A. Yes.
Q. Okay.
And so my point is with respect to item number one, you elected to believe what she told you in the parking lot as opposed to what she told the Fire Department and the Police Department in the recorded interview, correct?
A. Correct.
Q. All right.
MR. BETKE: Now, with respect to the finding evidence of smoking materials in the room, can we put up the -- I -- you had -- you had proffered some exhibits, John, earlier this week, and I wouldn't mind

if you -- if you could put them up for me, I'd be much appreciat -- I'd appreciate it.
MR. MACMILLAN: Yeah. Hold on a second. And so are you referring to the -- the two photos that I talked about --
MR. BETKE: Yes.
MR. MACMILLAN: -- before?
MR. BETKE: Yes. Yes. Please, sir.
MR. MACMILLAN: So let me know if that takes up too much of your screen.
MR. BETKE: No. That's good. That's good.
Q. (By Mr. Betke) Mr. Rice, are you familiar with this photograph?
A. Oh. Let's see. I would have to say vaguely. I'm sure it's from the scene.
Q. Yeah. Okay.
MR. BETKE: John, can you scroll down to the second one?
MR. MACMILLAN: Yeah.
Q. (By Mr. Betke) All right. Do you see here -- if you look -- I don't know -- almost the center of this -- of the screen but a little higher up there -- there -- there's a cigarette butt; is there not?
A. There is.

Q. And that's a cigarette -- that's a -- that's a cigarette butt and it's of a cigarette that's been smoked, correct?
A. It appears to be, yes.
Q. All right.
And how do you rule this cigarette butt itself -- and I'm going to talk about cigarette butts general -- you know, cigarettes generally, but how do you rule this cigarette butt out as the cause of the fire?
A. There's -- there's nothing burned around it. Looks like it's on top of the carpet that was under the -- maybe that's the base of the TV or a stand?
Q. Okay.
Well, is it your belief that that was there prior to the fire or could it have been moved there in suppression efforts or something else?
A. Could have been moved there during suppression effort -- efforts.
Excuse me.
Q. It also could have been there prior to the fire, correct?
A. Correct.
Q. Would you agree with me that if it was there prior to the fire, that that's not really a good place



to dispose of cigarette butts?
A. Yes.
Q. All right.
And that's indicative -- that's indicative if it was there prior to the fire -- in other words, if that cigarette butt was just left on the floor either accidentally or intentionally, that that's indicative of someone not properly taking care with cigarette butts, correct?
A. Correct.
Q. All right.
And if you don't know whether that was there before or after the fire, then we don't know whether or not Mr. Davis took proper care with cigarette butts prior to the fire in his room, correct?
A. Correct.
Q. Now, do -- did Ms. -- did Ms. -- no. Did Lynn. I was going to -- I almost tried to say her name, and that would have been a mistake.
Did Lynn tell you -- I'm sorry. Did Lynn tell the Everett Police and Fire Department when Mr. Davis would smoke in his room?
A. Are you asking like certain times or --
Q. Yeah. Yeah. What would precipitate it?
A. I don't know.

Q. Okay.
Well, isn't it true that one of the things she told them is he would do it when they fought?
A. Yes. I do remember that.
Q. Okay.
And you don't dispute that they had a fight that day, do you?
A. No.
Q. No, you do not dispute it.
A. I do not dispute it.
Q. Okay.
And in -- in -- in addition Lynn told the Everett Police in that recorded interview that she smelled cigarette smoke coming from that room earlier in that day, didn't she?
A. Yes.
Q. And she also told them that she be -- he started smoking in that room two -- two or three years before the fire and she couldn't make him stop. Didn't she say that?
A. She did.
Q. And she wanted him -- and you reference in your report -- and -- you reference in your report that you didn't find -- like you found out on the patio a can that had remnants of cigarettes, correct?

A. Correct.
Q. And that was certainly a more -- more robust amount of cigarettes than this one cigarette that you found on the floor of his room, right?
A. Yes.
Q. Okay.
But isn't it true that -- both Lynn and Mark smoked, correct?
A. Yes.
Q. And she was adamant about using the can out on the porch, right?
A. Yes.
Q. And sometimes Mr. Davis would use the can on the patio and sometimes he wouldn't, correct?
A. Correct.
Q. So at least with respect to the can out there, it's not surprising that you would find more cigarettes there because in essence you had two smokers using that can to put out cigarettes at any given time. Isn't that true?
A. True.
Q. And Lynn did not smoke in -- in the house at all, period, next sentence, correct?
A. You know, I -- I can't say that with a hundred percent accuracy, but that's what she alluded

to.
Q. And -- she was pretty adamant about it when she said that to the police, right?
A. She was.
Q. All right.
You have no reason to disbelieve her statement, do you?
A. No.
Q. And in fact, her statement in the -- about the -- her statement about the -- using the can on the patio that she used it is consistent with what you found out there, right?
A. Yes.
Q. Okay.
Now, did Lynn consider Mr. Davis a safe and responsible person?
A. I don't believe so.
MR. BETKE: John, you can take down the -- oh, you got that --
THE WITNESS: You got it rotated.
MR. MACMILLAN: I did get it rotated. I was going to --
MR. BETKE: All right. So let's -- is this -- Lynn, is this -- I'm sorry. Lauren, is this Exhibit 3?



THE REPORTER: Yes.
Q. (By Mr. Betke) Just going back --
MR. BETKE: Thank you.
Q. (By Mr. Betke) Just going back to Exhibit 3 since we have it up here, and I'm not suggesting it makes any difference, but in looking at it, does -- in correct view of it does that help you identify that as the Mark Davis room?
A. Yes.
Q. Okay.
So Exhibit 3 -- it -- and it looks to have been taken on 1/1/2016 at 8:40. Is it your understanding that this is a photograph that the Fire Department took post fire?
A. Yes.
Q. Are you able to identify the notebook computer in that?
A. No.
Q. All right. I -- I -- I didn't think so, but I figured I'd ask. All right.
MR. BETKE: Thank you. You can -- you can take that down, John. Thank you.
MR. MACMILLAN: Let me get out of here. Okay.
Q. (By Mr. Betke) Now, Lynn told the -- the

Police and the Fire Department detectives that she had stopped accidents so many times in that house, right? Or --
A. That --
Q. -- apartment.
A. -- she what? I'm sorry.
Q. That she had stopped so many accidents that Mr. Davis was going to cause in that apartment, correct?
A. Yes.
Q. And she described some dangerous behaviors -- whether they're true or not certainly, she -- she believed he engaged in dangerous behaviors, including such things as turning on a gas grill without the pilot light being on -- without the pilot being on and then the smell of gas being everywhere, right?
A. I do remember that.
Q. And you're -- as a -- as a police officer and a fire investigator you're certainly not surprised to hear that people who drink a lot of vodka on a regular basis sometimes engage in either dumb or -- or unsafe behaviors, correct?
A. Correct.
Q. All right.

Now, you mentioned in the report about fire-safe cigarettes. Now, you're not suggesting that cigarettes can't cause fires, are you?
A. Pardon me?
Q. I said, you're not suggesting that cigarettes can't cause fires, are you?
A. No.
Q. All right.
Plenty of fires are started by fire -- so-called fire-safe cigarettes. Isn't that true?
A. True.
Q. Thousands and thousands of fires are attributed to cigarettes that are caused by fire-safe cigarettes. Isn't that true?
A. True.
Q. All right.
Do you believe that what occurred on the day of this fire between Lynn and Mark Davis was a domestic violence situation?
MR. MACMILLAN: Object to the form of the question.
And you can still answer, Ken.
A. I -- you know, I -- I can't -- I don't have the answer whether it was a true domestic violence situation because I don't -- the criminal laws of

Washington -- I've not been a police officer here. I was in Arizona. In Arizona it could have been a disorderly conduct type, DV we would call, assign DV to it, because they're in the same household. I just don't know the -- the domestic violence laws and --
Q. (By Mr. Betke) Well --
A. -- how they apply in Washington.
Q. Well, you would certainly agree it was not a kind, loving interrelationship, right?
A. Correct.
Q. The -- you ruled out an intentionally-set fire here, right?
A. I did.
Q. Can you state for the record the basis for ruling out an intentionally-set fire.
A. Just the totality of the interviews with her. I didn't find any evidence of any type of accelerant used. He was -- when she contacted him he couldn't quite understand, but he was verbal in the recordings. He left the unit. Just typically what we see on intentionally-set fires, it just -- it -- it just didn't make sense.
Q. Well, you already agreed with me that he didn't need to use accelerants to start the fire, right? Because you said a lighter and piles of linens



and clothes could be a way a fire could start, right?
A. Correct.
Q. Okay.
So as far as it being an intentionally-set fire, one way Mr. Davis could have done that is by putting linens and clothing on the bed and lighting them on fire, right?
A. Correct.
Q. And he had a lighter and he had those materials, correct?
A. Correct.
Q. All right.
And -- then you said her -- the interviews. And what interview -- what -- what is it about the interviews that lead you to conclude that he didn't intentionally set the fire?
A. She just never alluded to the fact that he wanted to, you know, destroy anything that he had.
Q. Okay.
A. I mean, typically we look at means, motives, and opportunity, correct? So he had the -- the -- the means and the opportunity. I just couldn't come up with a clear motive as to why he would want to destroy his own -- little of what he had but let alone his personal belongings.

Q. When you say she didn't come up with it are you referring to Lynn?
A. Lynn.
Q. And so did she not come up with a motive in her police interview or in what she told you or both?
A. What she told me.
Q. Okay.
Do you believe in the police interview she suggested a motive?
A. I do.
Q. Okay.
So in order for us to exclude the motive part of the different means, motive, and opportunity -- right? -- he had means and opportunity, but he didn't have motive, to your understanding, we have to accept what she told you in her -- in your interview with her in the church parking lot and not what she told the police. Is that fair?
A. Fair, yes.
Q. Okay.
Because she was pretty clear that in the police -- when she talked to the police that she believed he intentionally set this fire, right?
A. Correct.
Q. And in fact, they had a -- let's call it --

to take it out of the legal realm, would you agree with me they had a pretty significant domestic dispute that day? Right?
A. Yes.
Q. And she had told him that she wanted to see other people, she was going to try to get a job as fast as she could and move out when she could, correct?
A. Correct.
Q. And what was his response to her?
A. I believe in my notes -- let's see. They were in the living room watching TV and she told him she wanted to leave him and end the relationship. He told her, quote, "Fuck you," and went into his bedroom.
Q. Yeah.
And in fact -- and in fact, she tes -- she said in the -- in the police interview he yelled at her, "Fuck you, fuck you, fuck you, fuck you, fuck you, fuck you," right?
A. Yes.
Q. Six times at least, right?
A. Yes.
Q. And those were, according to her, the last words he ever said to her, right?

A. Yes.
Q. Did she -- what did she say in the police interview regarding what she believed his state of mind was?
A. I don't recall that right off the top. She may have mentioned that he was suicidal.
Q. Okay.
All right. I'm going to read you -- on page 74 of her recorded interview it -- here's what it says. Detective Atwood says, "And... these" -- "And TV these days. Anyways, so what, what -- in your best guess, what do you think his frame of mind was?"
"MS. YEVROVICH:" -- quote -- "She's leaving me. I hate her. I don't want to live anymore. I'm going to set this place on fire and burn up everything she has, because, you know, she doesn't -- she's not being with me and I feel like I paid for everything, which isn't true. I had lots of stuff before I met him.
And I'm just going to burn her place up so that she doesn't have anything anymore and I'll just die in the fire so they can't hold me responsible. That's what I think he might have been thinking."
Is -- is what I read consistent with your recollection of what she told the Everett Police and

MAGNA LEGAL SERVICES

Fire Department?
A. Yes, but not what she told me.
Q. Okay.
And, again -- so in order to rule out the intentionally-set fire and rule out the -- the motive, as you pointed out, you'd have to conclude that what she told you was correct and what she said here was not correct, right?
MR. MACMILLAN: Object --
A. Yes.
MR. MACMILLAN: -- to the form.
Q. (By Mr. Betke) All right.
Now, are you -- are you familiar with statements made in the -- I'm sorry.
MR. BETKE: Strike that.
Q. (By Mr. Betke) Are you familiar with in the rebuttal report, which is Exhibit 2, there is a test of a cigarette burn on the bed?
A. I didn't have anything to do with that. I know that it's in there and I read it and saw that they had done that, but I wasn't a part of that.
Q. All right.
So you can't -- you couldn't answer any questions about that to me, correct?
A. No, I could not.

Q. All right.
And out of the -- all right.
MR. BETKE: Strike that.
So I have no further questions.
MR. MACMILLAN: I have no questions.
MR. BETKE: All right. Thank you.
THE REPORTER: Chris --
MR. BETKE: And, Lauren, I would like a copy of the transcript.
MR. MACMILLAN: I would too, please.
THE REPORTER: Thank you.
MR. BETKE: And I would ask that you send it -- if you want, I'll put it in the Chat, but you can send it to cbetke@coughlinbetke.com.
THE REPORTER: I have that. Thank you.
MR. BETKE: Yeah. And then also could you add -- also send a copy to docket, D-O-C-K-E-T, @coughlinbetke.com; that's sort of a general catch-all?
THE REPORTER: Okay.
MR. BETKE: All right. Thank you.
THE REPORTER: John, do you want the witness to read and sign?
MR. MACMILLAN: I do, please, yeah.
MR. BETKE: All right. Thank you.

(Deposition recessed at 10:37 a.m.)
(Signature reserved.)

SIGNATURE

I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the CHANGE SHEET flyleaf page hereof.

Signed in __________________, Washington, this _________ day of ________________, 2023.

_________________________________
KEN RICE
Taken: February 15, 2023

Re: Philadelphia Indemnity v. HP
Cause No.: 2:19-cv-00138-RSM
Lauren G. Harty, RPR, CCR #2674

