1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PHILADELPHIA INDEMNITY
INSURANCE COMPANY,

Plaintiff,

v.

HEWLETT-PACKARD COMPANY,

Defendant.

CASE NO. 2:19-cv-00138-TL

ORDER ON MOTION FOR
SUMMARY JUDGMENT AND
MOTIONS TO EXCLUDE

17
18
19
20
21
22
23
24

This matter is before the Court on Defendant Hewlett-Packard Company's ("HP") three

motions: motion for summary judgment (the "Summary Judgment Motion," Dkt. No. 45);

motion to exclude the testimony and opinions of Michael Eskra (the "Eskra *Daubert* Motion,"

Dkt. No. 47); and motion to exclude the testimony and opinions of Ken Rice (the "Rice *Daubert*

Motion," Dkt. No. 49). Having considered the relevant record and finding oral argument

unnecessary, *see* LCR 7(b)(4), the Court rules on the three pending motions as explained below.

1

I.      BACKGROUND[1]

2
This case arises out of a December 31, 2015, fire that caused significant damage to an

3
apartment complex (known as the "Bluffs at Evergreen") and its residents in Everett,

4
Washington. Dkt. No. 45 at 2. The fire originated in Unit E101, which was occupied by Lynn

5
Yevrovich and Mark Davis at the time. *Id.* Unit E101 was a two-bedroom apartment. Dkt.

6
No. 46-1 at 4.

7
A diagram of the apartment is reproduced below:

8

9

10

11

12

13

14

15

16

17

18

19

20



21
Dkt. No. 50-1 at 4, fig. 2 (Rice expert report).

22

23
[1] Unless otherwise indicated, the facts summarized in this section do not appear to be disputed by the Parties. *See*

24
Dkt. No. 55 at 2 ("In general, Plaintiff does not take issue with the factual background of the case offered by
Defendant.").

ORDER ON MOTION FOR
SUMMARY JUDGMENT AND
MOTIONS TO EXCLUDE - 2

At the time of the fire, Ms. Yevrovich and Mr. Davis had a long-term relationship that, at times, was romantic in nature. Dkt. No. 46-1 at 10. Mr. Davis's room was "messy." *Id.* at 11. Mr. Davis's room contained a bed, a non-functioning TV, and some other furniture and belongings. Dkt. No. 55-3 at 8; Dkt. No. 46-1 at 12, 14 (bed description). Mr. Davis's room also contained an HP laptop that Mr. Davis had purchased earlier that month, model number 15-AC132DS and serial number CND5369NS1 (the "Laptop"). Dkt. No. 46-3 at 2; Dkt. No. 50-1 at 8 (summary of police investigation). The Laptop contained a lithium-ion battery, containing battery cells that provided power to the Laptop. Dkt. No. 46-3 at 4.

On New Year's Eve 2015, Mr. Davis appeared to be intoxicated by at least 10:00 or 11:00 a.m. Dkt. No. 46-1 at 7–9. According to Ms. Yevrovich, this was not unusual for Mr. Davis. *Id.* Ms. Yevrovich also smelled cigarette smoke coming from Mr. Davis's room at some point during the day. *Id.* at 15. Mr. Davis smoked cigarettes. *Id.* at 11. It is disputed, however, whether Mr. Davis smoked in his room. *Compare* Dkt. No. 45 at 3 (summary of details indicating that Mr. Davis smoked in his room), *with* Dkt. No. 50-1 at 6 ("Mark . . . did not smoke in the apartment.").

On the same day, in the early evening,[2] Ms. Yevrovich told Mr. Davis that she wanted to end their relationship, see other people, and move out of the apartment as soon as she could find employment. Dkt. No. 46-1 at 6–7. Mr. Davis reacted angrily and yelled "Fuck you!" repeatedly before demanding that Ms. Yevrovich leave his room. *Id.*

Approximately one to two hours later, Ms. Yevrovich was in the living room watching TV when she smelled non-cigarette smoke coming out of Mr. Davis's room, where Mr. Davis

---

[2] This may have been at roughly 5:00 to 6:00 p.m., based on Ms. Yevrovich's estimation of how long afterwards the fire broke out and the time stamp of her 9-1-1 call. *See* Dkt. No. 46-1 at 6–7, 19; Dkt. No. 50-1 at 9 (9-1-1 call summary, with 19:09:55 timestamp).

1  was located. *Id.* at 14; Dkt. No. 50-1 at 6. She rushed over to Mr. Davis's room and opened the

2  door, where she saw Mr. Davis[3] and a fire on his mattress. Dkt. No. 46-1 at 4–5; Dkt. No. 50-1 at 6.

3      Ms. Yevrovich called 9-1-1 to report the fire. Dkt. No. 50-1 at 9 (9-1-1 call summary).

4  Mr. Davis did not survive the fire. *Id.* at 7 (discovered deceased just outside Unit E101); *id.* at 8

5  (Medical Examiner's Office determination).

6      Ms. Yevrovich was interviewed several times about the fire. On the day of the fire, she

7  was interviewed at the scene by Officer Ryan Hanks of the Everett Police Department ("EPD"),

8  who responded to reports of the fire. Dkt. No. 50-1 at 7. Ms. Yevrovich then prepared a written

9  statement for EPD on the same day. *Id.* On January 6, 2016, Detective Michael Atwood and Fire

10  Investigator James McCall of EPD and the Everett Fire Department conducted a video-recorded

11  interview of Ms. Yevrovich regarding the fire. Dkt. No. 46-1 (transcript excerpts). Ken Rice,

12  Senior Fire Investigator of Jensen Hughes and one of Plaintiff's retained experts, also

13  interviewed Ms. Yevrovich on January 8, 2016. Dkt. No. 50-1 at 6 (summary of interview).

14  Ms. Yevrovich is now deceased. Dkt. No. 45 at 3.

15      Plaintiff brings this action, as the insurer and subrogee of DH&G, LLC, which held an

16  insurance policy covering property damage at the Bluffs at Evergreen at the time of the fire, for

17  insurance payments covering the damages suffered by DH&G as a result of the fire. Dkt. No. 1-2

18  at 1–2, 5 (complaint); Dkt. No. 45 at 1, 3. Plaintiff alleges that the fire was caused by an internal

19  failure of the lithium-ion battery in the Laptop. Dkt. No. 1-2 at 3. Plaintiff asserts claims of

20  negligence and strict product liability under Washington law. *Id.* at 3–5.

21

22  ---
   [3] Ms. Yevrovich made inconsistent representations regarding Mr. Davis's position and behavior at the time she
   discovered the fire: (1) she and Mr. Davis "got out the door" together (Dkt. No. 50-1 at 9 (9-1-1 call)); (2) Mr. Davis

23  was asleep when she discovered the fire, and she unsuccessfully tried to wake him up (*id.* at 7 (December 31, 2015,
   interview); Dkt. No. 46-2 at 7–8 (same)); and (3) Mr. Davis remained standing still, staring at the fire, when she

24  discovered the fire in his room and did not leave with her (Dkt. No. 46-1 at 10 (January 6 interview); Dkt. No. 50-1
   at 6 (January 8 interview)).

1   Discovery has concluded in this case. Dkt. No. 41 (March 15, 2023, deadline). Defendant

2   moves for summary judgment (Dkt. Nos. 45, 56) and seeks to exclude the expert testimony of

3   Michael Eskra, Plaintiff's battery expert (Dkt. No. 47, 58) and Mr. Rice, Plaintiff's fire

4   investigation expert (Dkt. Nos. 49, 57). Both experts have prepared reports (Dkt. Nos. 50-1,

5   50-3) and have been deposed (Dkt. Nos. 48-2, 50-2). Plaintiff does not challenge Defendant's

6   experts Dr. Jeff Colwell (Dkt. No. 46-2 (Colwell expert report)) and Dr. Quinn C. Horn (Dkt.

7   No. 46-4 (Horn expert report)), who dispute Plaintiff's expert opinions. Plaintiff opposes all

8   three motions. Dkt. Nos. 55, 54, 53. Jury trial in this matter is set to begin on October 16, 2023.

9   Dkt. No. 41.

## II.   LEGAL STANDARD

### A.   *Daubert* Motions

Federal Rule of Evidence ("FRE") 702 provides that "a witness who is qualified as an

expert by knowledge, skill, experience, training, or education may testify" if:

> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the evidence or
> to determine a fact in issue; (b) the testimony is based on sufficient
> facts or data; (c) the testimony is the product of reliable principles
> and methods; and (d) the expert has reliably applied the principles
> and methods to the facts of the case.

This imposes an obligation on the court to act as a gatekeeper and evaluate the admissibility of

expert opinion testimony by ensuring that such evidence is both relevant and reliable. *See Kumho*

*Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms.,*

*Inc.* (*Daubert I*), 509 U.S. 579, 589 (1993)); *see also Estate of Barabin v. AstenJohnson, Inc.*,

740 F.3d 457, 463 (9th Cir. 2014) (en banc) ("We have interpreted [FRE] 702 to require that

'[e]xpert testimony . . . be both relevant and reliable.'" (alteration in original) (quoting *United*

1   *States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001))), *overruled on other grounds by United*

2   *States v. Bacon,* 979 F.3d 766 (9th Cir. 2020) (en banc).

3       "Expert opinion testimony is relevant if the knowledge underlying it has a valid

4   connection to the pertinent inquiry." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d

5   960, 969 (9th Cir. 2013) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)). Expert

6   opinion "is reliable if the knowledge underlying it has a reliable basis in the knowledge and

7   experience of the relevant discipline." *Id.* (quoting *Primiano*, 598 F.3d at 565); *see also Gen.*

8   *Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting opinion evidence "that is connected to

9   existing data only by the *ipse dixit* of the expert" should not be admitted, or where there is

10  "simply too great an analytical gap between the data and the opinion proffered").

11      To assess the reliability of an expert opinion, courts ordinarily look to such factors as:

12  (1) whether the expert's theory or technique can be tested; (2) whether it has been subjected to

13  peer review and publication; (3) its known or potential error rate; and (4) whether it enjoys

14  general acceptance within the relevant community. *Estate of Barabin*, 740 F.3d at 463 (citing

15  *Daubert I*, 509 U.S. at 592–94) ("The Supreme Court has suggested several factors that can be

16  used to determine the reliability of expert testimony . . . ."). This is a flexible inquiry, however,

17  and the trial court has discretion to decide how to assess the reliability of opinion testimony

18  based on the particular circumstances of each case. *Primiano*, 598 F.3d at 564 (quoting *Kumho*

19  *Tire Co.*, 526 U.S. at 150, 152). The court may, but is not required to, hold a "*Daubert* hearing"

20  to determine the relevance and reliability of an expert opinion. *Estate of Barabin*, 740 F.3d

21  at 463–64.

22      Notably, "[t]he test under *Daubert* is not the correctness of the expert's conclusions but

23  the soundness of his methodology." *Primiano*, 598 F.3d at 564 (quoting *Daubert v. Merrell Dow*

24  *Pharms., Inc.* (*Daubert II*), 43 F.3d 1311, 1313 (9th Cir. 1995), *on remand from Daubert I*, 509

1   U.S. 579). "Shaky but admissible evidence is to be attacked by cross examination, contrary

2   evidence, and attention to the burden of proof, not exclusion." *Id.*

3   **B.      Motion for Summary Judgment**

4           Summary judgment is appropriate where "the movant shows that there is no genuine

5   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

6   Civ. P. 56(a). A genuine issue of material fact exists where "the evidence is such that a

7   reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

8   477 U.S. 242, 248 (1986). The inquiry turns on "whether the evidence presents a sufficient

9   disagreement to require submission to a jury or whether it is so one-sided that one party must

10  prevail as a matter of law." *Id.* at 251–52.

11          The court must draw all justifiable inferences in favor of the non-movant. *Id.* at 255. The

12  court does not make credibility determinations or weigh evidence at this stage. *Munden v.*

13  *Stewart Title Guar. Co.*, 8 F.4th 1040, 1044 (9th Cir. 2021); *see also Lujan v. Nat'l Wildlife*

14  *Fed'n*, 497 U.S. 871, 888 (1990) ("[W]here the facts specifically averred by [the non-moving]

15  party contradict facts specifically averred by the movant, the [summary judgment] motion must

16  be denied.").

17          If the non-movant bears the burden of proof at trial, the movant only needs to show an

18  absence of evidence to support the non-movant's case. *In re Oracle Corp. Secs. Litig.*, 627 F.3d

19  376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once such a

20  showing is made, the burden shifts to the non-movant to show more than the mere existence of a

21  scintilla of evidence in support of its case—the party must show sufficient evidence that a jury

22  could reasonably find for the non-movant. *Id.* (citing *Anderson*, 477 U.S. at 252). Even if the

23  non-movant does not have the burden of proof at trial, it must nonetheless show that a genuine

24  issue of material fact exists by presenting evidence in its favor. *F.T.C. v. Stefanchik*, 559 F.3d

1   924, 929–30 (9th Cir. 2009) (affirming summary judgment for plaintiff where defendants failed

2   to show significantly probative evidence to dispute plaintiff's evidence). In short, the Federal

3   Rules of Civil Procedure "mandate[] the entry of summary judgment, after adequate time for

4   discovery and upon motion, against a party who fails to make a showing sufficient to establish

5   the existence of an element essential to that party's case, and on which that party will bear the

6   burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322 (citing Fed. R. Civ. P. 56(c)).

### III.   DISCUSSION

8   Because the Summary Judgment Motion relies in large part on the *Daubert* Motions, the

9   Court addresses the *Daubert* motions before turning to the Summary Judgment Motion. Based on

10  its review of the record, the Court finds that a *Daubert* hearing is not required. *See Estate of*

11  *Barabin*, 740 F.3d at 463 (noting *Daubert* hearings, while commonly used, "are certainly not

12  required").

### A.   Motion to Exclude Expert Testimony of Mr. Eskra

14  Mr. Eskra, Plaintiff's battery expert, has over thirty years of experience in the energy,

15  power source, and battery industry, including numerous publications and employment positions

16  dealing with battery systems. Dkt. No. 48-1 at 40–54 (Eskra CV). Mr. Eskra prepared a report

17  containing his proffered expert opinions. *See* Dkt. Nos. 48-1, 55-4.

18  Applying the guidelines of the National Fire Protection Association's Guide for Fire and

19  Explosion Investigations ("NFPA 921")[4] and the scientific method, Mr. Eskra tested the

20  rechargeable battery system of an exemplar laptop for its operational conditions on both hard and

---

[4] NFPA 921 is a commonly recognized guide for fire investigation methodology. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1029 (9th Cir. 2022) ("NFPA 921 . . . has been consistently accepted as a suitable foundation for fire investigation testimony."); *In re Complaint of Shears*, No. C14-1296, 2016 WL 30019, at *2 (W.D. Wash. Jan. 4, 2016) ("Petitioners are correct that numerous courts have found NFPA 921 to be an acceptable guide for fire investigation methodology."). The Parties do not dispute the use of NFPA 921 guidelines by either expert—only whether the NFPA 921 guidelines were correctly followed.

1    soft surfaces. Dkt. No. 48-1 at 2. He also reviewed images and artifacts of the fire damage,

2    including CT scans of two (out of three total[5]) battery cells from Mr. Davis's room. *Id.*

3        Based on this investigation, Mr. Eskra opines that the December 31 fire was caused by a

4    lithium-ion battery cell in the Laptop. Dkt. No. 48-1 at 32. This is based on two main premises:

5    First, that one of the three battery cells in the Laptop, "Cell 2," developed an internal short due to

6    a mechanical defect such as a burr or twisted tabbing in the cell; and, second, that his testing

7    showed that when the exemplar laptop was permitted to automatically shut down and restarted

8    again,[6] the exemplar laptop reached a voltage level that causes cell damage and is known to

9    cause internal cell failures. *Id.* at 32. Mr. Eskra concludes that these two failures—the shorting of

10   Cell 2 and the low voltage levels—may have worked together to initiate the fire. *Id.*

11       From the Court's view, Mr. Eskra's proffered testimony can be divided roughly into three

12   buckets: (1) explanations of how lithium-ion batteries and related systems work (*see id.* at 3–8,

13   27–29); (2) opinions based on his review of the physical evidence and scans from the fire (*see id.*

14   at 8–12, 31); and (3) opinions based on his testing of an exemplar laptop and batteries (*see id.*

15   at 13–26, 27–32). Defendant does not appear to dispute Mr. Eskra's general qualifications to

16   opine on the Laptop and its battery cells or the relevance of Mr. Eskra's opinions. Nor could it—

17   Mr. Eskra has ample experience in the battery industry, and an opinion as to the cause and source

18   of the December 31 fire is at the core of Plaintiff's case. However, Mr. Eskra's methodology in

19

20   _____

     [5] Mr. Eskra does not explain why the third cell was not scanned. *See* Dkt. No. 48-1 at 8.

21   [6] The Court confesses some confusion as to the exact parameters of this experiment. For example, while Mr. Eskra's
     report explains that the automatic shutdown occurred because the laptop was left running a movie overnight, it is not
22   clear to the Court if the shutdown occurred because the laptop was unplugged and its battery was allowed to
     deplete—or if the laptop simply had an automatic shutdown timer unrelated to the battery. Dkt. No. 48-1 at 16. The
23   next steps of the experiment are described as a "recharge" (presumably, recharging the battery) and "rundown"
     (which is not explained). *Id.* at 18. The report states that this particular cycle of the experiment was the "second
     discharge," but it is not clear whether the same battery cell was used for the first discharge and whether the first
24   discharge occurred under similar circumstances (automatic shutdown). *Id.* at 14, 16.

1   forming his opinions otherwise suffers from certain defects. As explained below, the Court finds

2   that the first and second categories are admissible and that the third category is inadmissible.

3         **1.      Explanations of Lithium-Ion Batteries & Related Systems**

4         The only challenge Defendant makes against Mr. Eskra's explanations of lithium-ion

5   batteries and related systems is focused on the System Management Bus ("SMBus") of the

6   Laptop. Specifically, Defendant argues that any opinion from Mr. Eskra as to whether

7   Defendant's failure to fully utilize the SMBus and the battery management system in the Laptop

8   contributed to the December 31 fire (*see* Dkt. No. 48-2 at 12) is not admissible because

9   Mr. Eskra admitted that he is "not an SMBus expert" (*id.* at 6). Defendant also notes that

10  Mr. Eskra was not able to access the BMU chip in the Laptop, which would have provided him

11  with access to data regarding the role of the SMBus and battery management system in the

12  Laptop's battery cells. Dkt. No. 47 at 10–11. Plaintiff argues that Mr. Eskra's experience and

13  general expertise is sufficient to reliably opine on how the SMBus interacted with the battery in

14  the Laptop. Dkt. No. 54 at 8.

15        As Mr. Eskra explains in his report, the SMBus is the communication interface between a

16  computer and its battery pack. Dkt. No. 48-1 at 27. The SMBus is a relatively simple, two-wire

17  bus, commonly found on the motherboard of a computer, that can instruct the battery pack to be

18  in the on or off position and can communicate with the battery subsystem, which might include

19  monitoring the temperature, fans, voltage sensors, and other details. *Id.*

20        The Court generally agrees with Plaintiff that Mr. Eskra has shown sufficient expertise to

21  opine on the basic functions of an SMBus and the relationship between the SMBus and a laptop,

22  including the subject Laptop. It is evident from Mr. Eskra's detailed report and deposition that he

23  is well versed in the role that an SMBus can play in a battery system. Notably, Mr. Eskra's self-

24  effacing statement comes in the middle of this excerpt from his deposition:

> There's an SMBus capability that the laptop could say you're too
> low, I'm shutting you down. HP only uses a few of those channels.
> Let's say there's 50 available. *I'm not an SMBus expert.* But just
> from *seeing this over and over and over again* . . . .

Dkt. No. 48-2 at 6 (emphasis added). This only reinforces that, though he may not have studied

SMBuses specifically, Mr. Eskra has significant experience with the function of an SMBus as it

relates to the battery systems of laptops. *See United States v. Sandoval-Mendoza*, 472 F.3d 645,

655 (9th Cir. 2006) ("When evaluating specialized or technical expert opinion testimony, 'the

relevant reliability concerns may focus upon personal knowledge or experience.'" (quoting

*Kumho Tire Co.*, 526 U.S. at 150)). It may be that Mr. Eskra cannot explain the intricate details

of an SMBus, such as its precise components, manufacturing process, governing standards, and

the latest scholarship. But Mr. Eskra appears qualified to educate the layperson on the general

function of an SMBus in relation to a battery system. In the Court's view, to conclude otherwise

would be akin to excluding a fireman from opining on the expected *function* of a firetruck during

a fire emergency because he is not a self-professed expert of the intricately engineered

components of a firetruck.

Accordingly, the Court finds that testimony from Mr. Eskra regarding how lithium-ion

batteries and their related systems, including an SMBus, function is admissible. However, for the

reasons explained *infra*, Section III.A.3, any testimony regarding the Laptop's specific SMBus is

excluded to the extent that it is based on his study of the exemplar laptop and battery. *See, e.g.*,

Dkt. No. 48-1 at 27–29 (describing the SMBus on the exemplar laptop).

### 2. Review of Fire Damage Evidence

Mr. Eskra studied physical evidence of the fire damage, including CT scans of Cell 2

from the Laptop, and concluded that Cell 2 suffered an internal short from a mechanical defect

that caused the December 31 fire. Dkt. No. 48-1 at 32.

First, Defendant argues that Mr. Eskra's opinions are inadmissible because the two potential mechanical defects in Cell 2 that he listed, a burr or twisted tabbing, have been ruled out. Dkt. No. 47 at 8. But Mr. Eskra arguably provided the two options as *examples* of a mechanical defect that could have existed in Cell 2. *See* Dkt. No. 48-2 at 9 (confirming Mr. Eskra's conclusion that "some mechanical defect *such as* a burr or twisted tabbing" occurred (emphasis added)). *But see id.* at 10 ("[Y]ou believe that the mechanical defect is the twisted tab? / Correct."). Nor is it evident that Mr. Eskra must pinpoint the specific mechanical defect to be able to opine that one occurred—though, of course, his failure to do so may ultimately be weighed against his credibility by the jury.

In any case, Defendant fails to show that both potential mechanical defects are ruled out. While Defendant appears to be correct that Mr. Eskra has discounted the idea of a burr having been the mechanical defect in Cell 2 (*see* Dkt. No. 48-2 at 9, 10), there is no clear evidence as to whether twisted tabbing existed in Cell 2. Dkt. No. 47 at 9 (noting Mr. Eskra's changing position on this question). To the extent that Defendant relies on the affidavit of its expert, Dr. Quinn C. Horn, stating that he did not see any twisted tab on Cell 2 before it underwent destructive disassembly (Dkt. No. 48-3 at 2), the truth of such a statement is a question of credibility that is reserved for the factfinder.

Second, Defendant argues that Mr. Eskra's conclusion is flawed because, as Mr. Eskra admits, there is no known generally accepted, peer-reviewed publication "that stands for the proposition that one can look at the damage to lithium-ion battery cells post-fire and determine

1    whether they caused a fire." *Id.* at 11 (citing Dkt. No. 48-2 at 7).[7] Plaintiff counters that

2    Defendant over-simplifies Mr. Eskra's analysis of Cell 2. Dkt. No. 54 at 8–9.

3          Defendant engages in a strawman argument by requiring Mr. Eskra to show that his exact

4    analysis—each step of the analysis, in the same setting and with the same conclusion—is copied

5    and lifted from a publication. But that is not what is required. Mr. Eskra is permitted, as he does

6    here, to draw his own conclusion from individual steps of analysis, provided that the steps are

7    reliable: interpret CT scans of a damaged battery cell (*i.e.*, showing an internal short), opine as to

8    what may have caused the damage (*i.e.*, a mechanical defect), and whether the effect of such

9    damage can create conditions that can start a fire (*i.e.*, result in a thermal runaway event).

10   Defendant does not show that any of these specific steps of analysis leading to Mr. Eskra's

11   conclusion—which is the actual analysis Mr. Eskra followed—is unreliable. Indeed, Mr. Eskra

12   appends to his report a published article that helps support at least part of this analysis by

13   detailing the phenomenon of thermal runaway in lithium-ion battery cells from overdischarge

14   that can be induced by, among other potential causes, manufacturing defects. Dkt. No. 48-1

15   at 33. Defendant does not attack or otherwise address this portion of the report.

16          Accordingly, Mr. Eskra's testimony related to his observations and analysis of the

17   physical evidence from the fire is admissible. Defendant is free to attack his testimony through

18   the means traditionally used to defeat shaky but admissible evidence. *See Primiano*, 598 F.3d

19   at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary

20   evidence, and attention to the burden of proof, not exclusion.").

21

22

23

24

---

[7] Defendant seems to ask the Court to adopt the findings of another court rejecting the theory that the exact nature and extent of damage to a battery cell can be probative of whether the battery caused a fire. Dkt. No. 47 at 12 (citing *Gopalratnam v. Hewlett-Packard Co.*, No. C13-618, 2017 WL 1067768, at *10 (E.D. Wis. Mar. 21, 2017), *aff'd*, 877 F.3d 771 (7th Cir. 2017)). The Court evaluates and makes factual determinations based on the record in this case, not the expert opinions and record of another case, however similar.

### 3.    Exemplar Laptop and Battery Cells Testing

Defendant argues that Mr. Eskra's opinion is unreliable because he failed to ensure that the exemplar laptop and battery pack (and its cells) he used for testing were actual duplicates of the Laptop and its components—and indeed, Mr. Eskra acknowledged at his deposition that the exemplar battery cells were manufactured by a different company than those that had been in the Laptop.[8] Dkt. No. 47 at 4–6; Dkt. No. 58 at 3–4. Plaintiff argues that Defendant's concerns go to the weight of Mr. Eskra's testimony, not its admissibility, and that Mr. Eskra's use of the exemplar battery cells was justified because they were from an original equipment manufacturer ("OEM"). Dkt. No. 54 at 4–5.

This is a product liability case that alleges a manufacturing defect. By testing exemplar battery cells from a *different manufacturer* than that of the Laptop's battery cells, Mr. Eskra failed to obtain evidence that is actually relevant to evaluating whether the manufacturing process of the Laptop could have caused the December 31 fire. It is self-evident that the testing of an exemplar product must be sufficiently similar to the actual product at issue—in material aspects—to be relevant and helpful to the factfinder.[9] *See Romero v. S. Schwab Co.*, No. C15-815, 2017 WL 5494588, at *6 (S.D. Cal. Nov. 16, 2017) (excluding expert opinion based on exemplar shirt from a different manufacturer than that of the actual shirt involved in the fire, despite expert's representation that the exemplars were "almost identical" to the actual shirt).

Plaintiff merely points out that the exemplar battery cells were from an OEM, which Plaintiff argues means that the exemplar cells were guaranteed to be "virtually identical" to the

---

[8] Specifically, the Laptop contained a battery pack supplied by Simplo Technology Co. Ltd., with cells from Samsung SDI. Dkt. No. 46-3 at 2. There appear to have been three exemplar battery packs, and it is not clear whether they were all from Simplo or another manufacturer. *See* Dkt. No. 48-2 at 3. In any case, the exemplar cells in the packs were from LG Chem, not Samsung SDI. *Id.* at 4.

[9] For this reason, Plaintiff's argument that expecting Mr. Eskra to obtain exact duplicates of the cells in the Laptop is "unrealistic" (Dkt. No. 54 at 5) is baffling.

battery cells in the Laptop. Dkt. No. 54 at 4–5; *see also* Dkt. No. 48-2 at 3 (Eskra deposition). There is no reason for the Court to take this *ipse dixit* (the say-so) of Plaintiff and its expert at face value. Plaintiff provides no support to show that OEM products are consistently and reliably "virtually identical" to each other. There is no evidence of the level of oversight and control that Defendant exercises over its OEM products, for example, such that the Court can comfortably conclude that a manufacturing defect in one manufacturer's battery cell can be ascribed to a different manufacturer's battery cell. This is too large an analytical gap for the Court to bridge on its own. *See Joiner*, 522 U.S. at 146. Plaintiff has failed to show that Mr. Eskra's testing of the exemplar battery pack is either relevant to the evaluation of the Laptop at issue or reliable as to its methodology.

Further, Mr. Eskra's entire testing process is contaminated by this weakness, and the Court is unable to determine whether any conclusion reached from the testing is separately and independently reliable.[10] *See, e.g.*, *Romero*, 2017 WL 5494588, at *6 (excluding expert opinion where some of the exemplars were problematic and it was not possible to isolate which opinions were formed from the unreliable exemplars and which were not).

Accordingly, the Court EXCLUDES any testimony from Mr. Eskra arising out of his testing of the exemplar products.

### 4.    Insufficient Certainty in Opinion

Defendant argues that Mr. Eskra's opinions are, ultimately, speculative and must be excluded as unreliable on that basis. Dkt. No. 47 at 12–13. Defendant emphasizes the wording in different places of Mr. Eskra's report, highlighting the lack of certainty inherent in such phrases

---

[10] The Court also agrees with Defendant that Mr. Eskra's use of a dog bed to test the effect of a soft surface on the exemplar laptop and battery system (Dkt. No. 47 at 6–8) introduces significant issues of reliability and relevance. In any case, this point is moot given the Court's exclusion of all testimony related to the testing of exemplar products.

1  as "it is possible that," "might have," and that something "could" happen. *Id.* (citing Dkt.

2  No. 48-1). Plaintiffs argues that Mr. Eskra's opinions are not speculative and are within the

3  permissible realm of extrapolation and theory by an expert. Dkt. No. 54 at 9–10.

4        At first glance, based on Defendant's handpicked phrases, Mr. Eskra does appear to build

5  a shaky stack out of mere "maybe"s and "possible"s. But this largely amounts to rhetorical

6  wordplay. Mr. Eskra's conclusions are laid out in the Conclusions of his report with a sufficient

7  degree of probability,[11] and his analytical support for reaching these conclusions are what is

8  really at issue: that is, whether Mr. Eskra's underlying analysis is too *substantively* weak to

9  support his conclusions as to the cause of the fire.

10       Accordingly, the Court GRANTS the Eskra *Daubert* Motion (Dkt. No. 47) as to any

11  testimony from Mr. Eskra arising out of his testing of exemplar products and DENIES the motion

12  as to the remainder.

13  **B.     Motion to Exclude Expert Testimony of Mr. Rice**

14       Mr. Rice is a Senior Fire Investigator at Jensen Hughes retained by Plaintiff to investigate

15  the December 31 fire and determine its cause. Dkt. No. 50-1 at 2, 31 (expert report). Together

16  with Andrew Paris (Senior Electrical Engineer) and Paul Way (Director, Technical Manager

17  Electrical), Mr. Rice prepared a report containing his proffered expert opinions. *See* Dkt.

18  Nos. 50-1, 55-3.

19       Applying the NFPA 921 guidelines, Mr. Rice and his colleagues at Jensen Hughes

20  investigated the December 31 fire. Dkt. No. 50-1 at 2. This investigation included examinations

21

22

23

24

---

[11] From the Conclusion of Mr. Eskra's report: "The artifact cell 2 *developed* an internal short and *was* causal in the fire . . . . The CT scan of the cell can be used to *eliminate the possibility* that the cell was forced into a thermal runaway by the fire or external heating. . . . [T]he failure of the cell . . . *would happen* if a cell had some mechanical defect . . . and the cell was driven to a low voltage . . . . This *would cause* additional stress internal to the cell, weakening the separator[']s ability to prevent a shorting event." Dkt. No. 48-1 at 32 (emphases added).

of the scene of the fire, examinations of the Laptop and its components (as well as other physical evidence from the fire), an interview that Mr. Rice conducted of Ms. Yevrovich on January 8, 2016, a review of the audio and video recordings of the 9-1-1 call on the day of the fire and of Ms. Yevrovich's subsequent interview with the local police and fire departments, and the review of other relevant records and images. *Id.* at 2–3.

Based on his examination, Mr. Rice opines that: (1) the December 31 fire originated on Mr. Davis's bed in his room, in the southeast corner; and (2) the fire was caused by an internal failure of the Laptop's battery pack, which ignited the surrounding combustible materials. *Id.* at 31. These opinions are based in part on Mr. Rice's observations from his on-site examinations and physical evidence recovered from the scene. *Id.* at 10–12 (descriptions of the scene); *id.* at 13–21 (descriptions of the physical evidence studied separately). Among others, he noted the fire patterns in Mr. Davis's room, various electrical receptacles, and electronic devices (including the Laptop and three battery cells from the Laptop). *Id.* at 11–13, 21–22. There were no ashtrays or other receptacles used for cigarette butts found in the bedroom but there was, among other observations: (1) a cigarette butt under a television and on an unburned portion of the carpeted floor, (2) an unburned, empty pack of cigarettes, and (3) a partially burned butane container in a dresser. *Id.* None of the cigarette or cigarette-related items were in what he designated as the area of origin. *Id.* at 13. Other than the Laptop, Mr. Rice found no other device powered by lithium-ion batteries in the bedroom. *Id.*

Mr. Rice studied the Laptop and its battery components. *Id.* at 15. An X-ray image of the Laptop showed that the internal circuit boards and components were mostly intact, with the battery pack area being the most significantly damaged portion. *Id.* The battery pack itself was found separate from the Laptop. *Id.* at 17 (battery management unit); *id.* at 18 (battery cells). The Laptop was found with its power cord still plugged into the Laptop (though the rest of the cord

was severed), allowing the inference that the Laptop had been plugged in and energized at the time of the fire. *Id.* at 16–17. The three battery cells were fire-damaged and corroded. *Id.* at 19.

Listing witness information and/or electronic data, fire patterns, fire dynamics, and arc mapping as the four primary factors to determine the origin of a fire according to NFPA 921 § 18.1.2,[12] Mr. Rice used these four factors to rule out scenarios in which the fire was caused by Mr. Davis's intentional ignition of his bed or Mr. Davis falling asleep or passing out while smoking in his bed. *Id.* at 23–26. Mr. Rice concluded that the fire was caused by the Laptop's lithium-ion battery, noting that failed lithium-ion cells are a known, competent ignition source of fires. *Id.* at 26–30. As part of his analysis, Mr. Rice noted that Ms. Yevrovich's statements in her various interviews and written statement had inconsistencies, resulting in some confusion as to what happened on the day of the fire. *Id.* at 21.

Defendant does not appear to dispute Mr. Rice's general qualifications to conduct a fire investigation and opine on the potential cause of a fire, nor the relevance of his opinion as to the cause of the December 31 fire. Accordingly, except as otherwise indicated below, the Court finds that Mr. Rice is qualified to offer his opinions and that his opinions are relevant for the factfinder.

### 1.    The Laptop's Battery Pack

Defendant argues that Mr. Rice's opinion that the December 31 fire was specifically caused by an internal failure of the Laptop's battery pack, which ignited surrounding combustible materials, is inadmissible as speculative. Dkt. No. 49 at 3–4. As support, Defendant

---

[12] Defendant's expert Dr. Colwell provides the correct section in his report. Dkt. No. 46-2 at 29. Dr. Colwell represents that arc mapping was removed from the list of *main* factors used to determine fire origin from the more recent version of NFPA 921 dated 2021. *Id.* He does not opine, however, that arc mapping has been entirely eliminated as a factor to use in a fire investigation and, indeed, points to sections of the NFPA 921 that describes how to conduct arc mapping. *See id.* at 32–33. Mr. Rice also represents that arc mapping is a well-known technique in the field of fire investigations. Dkt. No. 50-1 at 22.

points to Mr. Rice's admission at his deposition that he was not offering any scientific opinions about the battery pack and battery cells involved in the December 31 fire. *Id.* at 4; *see also* Dkt. No. 50-2 at 4. Plaintiff acknowledges that Mr. Rice is not an expert on battery systems and its components and explains that Mr. Rice's conclusion relies on the expertise and opinion of Mr. Eskra. Dkt. No. 53 at 4.

The Court agrees with Defendant that Mr. Rice is not qualified to offer this opinion independently. While he may perhaps be able to opine on the combustibility of a laptop and lithium batteries generally, he has not demonstrated any expertise in the workings of a laptop and/or its battery system to opine on how an internal failure in the Laptop or its battery might have occurred. Nor does Plaintiff argue otherwise. And, to the extent that Mr. Rice draws that conclusion from Mr. Eskra, the Court has found Mr. Eskra's opinions to be flawed.

Accordingly, Mr. Rice's opinion that the December 31 fire was caused by an internal failure of the Laptop's battery is inadmissible. For the avoidance of doubt, this does not rule out Mr. Rice's opinions regarding the Laptop being at or near the origin of the December 31 fire and being a potential cause for the fire, if otherwise adequately based on his expertise and a reliable methodology.

### 2.    Adherence to NFPA 921 Guidance

The bulk of Defendant's objections to Mr. Rice's testimony is that, despite purporting to adhere to NFPA 921 guidance in investigating the December 31 fire, Mr. Rice deviated from NFPA 921 such that his opinions are unreliable and therefore inadmissible. Dkt. No. 49 at 4–12. Plaintiff counters that Defendants engage in improper handpicking of Mr. Rice's report to make its points, that Mr. Rice's methodology was reliable, and that, in any case, deviations from NFPA 921 guidelines are questions of weight, not admissibility. Dkt. No. 53 at 3–8. The Parties

do not dispute that NFPA 921 is an appropriate industry standard to follow in conducting a fire investigation.

As an initial matter, Plaintiff is correct that deviations from NFPA 921 methodology create questions of weight, not admissibility. *Kendall Dealership Holdings, LLC v. Warren Distribution*, a case that Defendant relies on, remarked on the absence of case law in this Circuit standing "for the proposition that any deviation from the NFPA 921 model renders an expert's testimony per se unreliable and thus inadmissible." 561 F. Supp. 3d 854, 860 (D. Alaska 2021). Indeed, the court noted, "[t]he rule in the Ninth Circuit is that only methodology or theory that is itself faulty is inadmissible; imperfect execution of laboratory techniques is not." *Id.* The court concluded that flaws in an expert's NFPA 921 methodology were questions of weight and not admissibility. *Id.* at 860–61.

The Court also agrees that, as a general matter, Defendant's objections to Mr. Rice's opinions almost entirely go to issues of credibility and weight, not admissibility, and therefore must be rejected at this stage. The Court is instructed by *Elosu v. Middlefork Ranch Inc.*, a recent opinion of the U.S. Court of Appeals for the Ninth Circuit that held that a fire inspector's opinion regarding the cause of a fire was admissible. 26 F.4th 1017 (9th Cir. 2022).

In *Elosu*, the plaintiff's expert was a fire investigator who conducted an analysis of a cabin fire and opined that the fire had been caused by an open-flame pilot light that ignited combustible vapors from an excessive oil stain applied to the wooden deck the prior day. *Id.* at 1020. The district court found the expert's testimony inadmissible because, in the court's view, only limited portions of the expert's report were substantive, the underlying facts were susceptible to competing interpretations, the expert relied too heavily on one account of the events over the others, and there were significant contradictions by eyewitness accounts of the fire. *Id.* at 1026. The Ninth Circuit reversed, holding that the district court had exceeded its role

as a gatekeeper by disregarding the expert's scientific analysis, weighing the evidence, and demanding corroboration. *Id.* at 1020. The Ninth Circuit explained that, "[a]lthough a district court may screen an expert opinion for reliability, and may reject testimony that is wholly speculative, it may not weigh the expert's conclusions or assume a factfinding role." *Id.* The Ninth Circuit emphasized that the FRE 702 inquiry simply "requires foundation, not corroboration," and that the *correctness* of an expert's opinion is left to the factfinding process, including the weighing of evidence and the "battle of the experts." *Id.* at 1025–26. Finally, the Ninth Circuit pointed out:

> The fact that [a fire investigator's] testimony relied on circumstantial evidence and inferences is neither unusual nor unexpected, as fires routinely destroy all evidence of their origins. By the very nature of a fire, its cause must often be proven through a combination of common sense, circumstantial evidence and expert testimony. Accordingly, fire investigation, no less than medicine, requires sound judgment in the face of uncertainty.

*Id.* at 1028 (internal quotation marks omitted) (citations omitted) (quoting *Ricci v. Alt. Energy Inc.*, 211 F.3d 157, 162–63 (1st Cir. 2000)).

Defendant takes issue with Mr. Rice choosing to focus on certain factors over others in his investigation or adopting one version of the facts over another. Defendant's arguments are not entirely unpersuasive. But, as in *Elosu*, Defendant fails to show that Mr. Rice's methodology was so flawed as to be unreliable. *See State Farm Fire & Cas. Co. v. Hewlett-Packard Co.*, No. C13-328, 2015 WL 5821898, at *4–5 (E.D. Wash. Oct. 5, 2015) (denying HP's motion to exclude fire investigator expert testimony); *see also Romero*, 2017 WL 5494588, at *3 ("Many of the parties' arguments challenge how the recognized methodology in the industry was used by each expert and his interpretation. These disputes challenge the conclusions of the experts, and not the reliability of the expert's testing method.").

1    More specifically, Defendant represents that Mr. Rice concluded the Laptop was the

2    cause of the December 31 fire because it was significantly damaged and argues that this is

3    contrary to NFPA 921 § 25.3.2, which instructs that the degree of damage to an appliance does

4    not necessarily indicate that the fire originated with the appliance. Dkt. No. 49 at 5–6. Defendant

5    similarly represents that Mr. Rice concluded Mr. Davis's bed was the origin of the fire because it

6    sustained substantial damage and then argues that this is contrary to NFPA 921 § 18.4.1.3, which

7    instructs that fire patterns showing the greatest damage in one area is not necessarily the area of

8    origin. Dkt. No. 49 at 6. As Plaintiff points out, however, this argument misrepresents Mr. Rice's

9    analysis and opinion. Mr. Rice conducted a comprehensive, fact-intensive investigation that

10   included a review of the fire damage and witness interviews. Nowhere in Mr. Rice's report or his

11   deposition (that the Court has been provided with) does he state that he drew these two

12   conclusions *solely* on the basis of the degree of damage to the Laptop or the bed, respectively.

13   Indeed, Defendant itself cites to Mr. Rice's acknowledgement that such a simplified analysis is

14   inappropriate. Dkt. No. 50-2 at 5, 8. Nor does Defendant argue that, according to NFPA 921, the

15   degree of damage to an appliance or one area is *irrelevant* to the fire investigation, such that *any*

16   consideration of these factors in Mr. Rice's investigation renders his conclusions inadmissible.

17   Defendant's arguments are a disguised attempt at challenging the weight given to different

18   factors in Mr. Rice's investigation—an inquiry that is best reserved for the factfinder.

19        Defendant also argues that Mr. Rice's interview with Ms. Yevrovich was an improper

20   basis for Mr. Rice's investigation. Dkt. No. 49 at 7–8. But Defendant misreads NFPA 921 in

21   making this argument. NFPA 921 § 14.5.1.5 recommends that all interviews be "documented"

22   and *suggests* audio recordings, video recordings, and taking written notes during the interview as

23   common methods. *Id.* at 7. Mr. Rice took written notes of his interview, apparently after the

24   interview was concluded. Dkt. No. 50-2 at 6. This is essentially all that NFPA 921 recommends.

Despite Defendant's emphasis on Mr. Rice's failure to *record* the interview, what is important is that Mr. Rice documented the substance of the interview.[13] Mr. Rice's reliance on his interview with Ms. Yevrovich over her other interviews, which forms the basis of many of Defendant's arguments, is a question of credibility best reserved for the factfinder.[14]

Defendant's arguments that Mr. Rice purportedly "failed to consider" certain alternate causes of the December 31 fire suffer from the same flaw. Dkt. No. 49 at 8–11. This argument is misleadingly worded. Mr. Rice did not "fail to consider" Mr. Davis's smoking or Mr. Davis's willful actions as potential causes of the fire. *Id.*[15] Again, Defendant really takes issue with the weight that Mr. Rice gave to certain factual evidence over others, such as relying on one statement by Ms. Yevrovich that Mr. Davis did not smoke in his bedroom rather than her statement that Mr. Davis did smoke in his bedroom. *See* Dkt. No. 50-2 at 9–10. Defendant, however, has not shown that Mr. Rice was not aware of or did not consider the evidence Defendant contends runs contrary to his conclusions.[16] And, as Plaintiff points out, Mr. Rice was under no obligation to take Ms. Yevrovich's *conjectures* about Mr. Davis's state of mind on the

---

[13] Indeed, NFPA 921 § 14.5.1.5 itself issues this caution: "All of these methods, however, may distract or stress the person being interviewed, resulting in some information not being obtained. All recordings must be done in accordance with applicable laws and regulations." Dkt. No. 49 at 7. In short, NFPA 921 does not mandate simultaneous recording of a witness interview and recognizes the flaws of such a technique. And, while Defendant emphasizes Mr. Rice's *capability* to record the interview with his phone, Defendant does not show that a live recording of the interview would not have compromised Mr. Rice's interview (if done with Ms. Yevrovich's permission) nor that it would have complied with all laws (if done without permission).

[14] This is particularly appropriate here, where—as Mr. Rice himself noted (Dkt. No. 50-1 at 21)—there are significant contradictions in Ms. Yevrovich's various descriptions of the day of the fire. *See, e.g.*, *supra*, note 3 (flagging inconsistent statements from Ms. Yevrovich as to what Mr. Davis was doing at the time of the fire).

[15] Defendant's insistence that Mr. Rice had a "preconceived theory" and then rejected evidence that contradicted it is also unsupported and speculative. *See* Dkt. No. 49 at 9.

[16] Defendant argues that Mr. Rice's statement that no smoking materials were found at the fire scene is contradicted by the cigarette butt found on the floor of Mr. Davis's room. Dkt. No. 49 at 9. But Mr. Rice explained that he did not give significant weight to the cigarette butt in his analysis because it had been found in an unburned area of the room (under the TV and across the room from the mattress). Dkt. No. 50-1 at 24; Dkt. No. 50-2 at 10. It does not matter if the Court agrees with Defendant. Whether Mr. Rice's explanation is credible is a question for the jury.

day of the fire as fact. *Compare* Dkt. No. 49 at 11 (accusing Mr. Rice of "disregarding everything Yevrovich told the police"), *with* Dkt. No. 50-4 at 21 ("[S]o what, what -- in your best *guess*, what do you think his frame of mind was?" / "I'm going to set this place on fire . . . . That's what *I think* he *might* have been thinking. Or *maybe* he's standing there staring at it because he's out of his mind . . . ." (emphases added)). That Mr. Rice does not appear to have accepted Ms. Yevrovich's suggestion as to a possible motive on Mr. Davis's part to "burn her place up" does not render Mr. Rice's opinion "astounding." Dkt. No. 49 at 10–11.

Finally, Defendant argues that Mr. Rice's opinions about the Laptop should be entirely disregarded because NFPA 921 § 19.4.4.2.1 recommends the consideration of how safety devices and features designed to prevent fires operated or failed to operate. Dkt. No. 49 at 12. This yet again contorts NFPA 921 by equating fire safety systems with a laptop (which is not evident from the plain language of the guidelines) and insisting that NFPA 921 *requires* a full explanation of how any device that may have caused a fire could have started the fire. In short, Defendant appears to demand full expertise of all mechanical or electronic devices that *might* have caused a fire for every fire investigator. The Court declines to adopt such an absurd reading of NFPA 921.

Accordingly, the Court GRANTS the Rice *Daubert* Motion (Dkt. No. 49) as to Mr. Rice's opinion that the fire was caused by an internal failure of the Laptop's battery pack but DENIES the motion as to the remainder.

## C.     Motion for Summary Judgment

Plaintiff asserts two causes of action: negligence and strict product liability. Dkt. No. 1-2 at 3–5 (complaint). Defendant moves for summary judgment on two issues: First, that Washington law does not permit a claim for negligence in a product liability action (Dkt. No. 45 at 5); and second, that Plaintiff has failed to show a genuine issue of material fact as to whether

the HP laptop caused the fire in question, given that Plaintiff's expert opinions are based on speculative facts and are unreliable (*id.* at 7–8).

### 1.      Negligence Claim Under Washington Law

Plaintiff concedes that the Washington Product Liability Act, which governs all product liability claims under Washington law, does not permit an action for negligence as a matter of law. *Macias v. Saberhagen Holdings, Inc.*, 282 P.3d 1069, 1073–74 (Wash. 2012) (en banc) (holding that the Washington Product Liability Act "supplants all common law claims or actions based on harm caused by a product"); *see also* Dkt. No. 45 at 5 (citing cases); Dkt. No. 55 at 5 ("Plaintiff will proceed in this case under only its claim for strict product liability.").

Accordingly, Plaintiff's negligence claim is DISMISSED.

### 2.      Reliance on Expert Testimony

Defendant argues that, because Plaintiff's case is premised on expert testimony from Mr. Rice and Mr. Eskra as to the cause of the fire, Plaintiff cannot prevail on its claim. Dkt. No. 45 at 7–8. As Plaintiff acknowledges, this argument rests on finding the two experts' opinions as inadmissible. *See* Dkt. No. 55 at 5.

While the Court has found portions of Mr. Rice and Mr. Eskra's expert opinions to be inadmissible, enough of their opinions remain to plausibly permit a factfinder to find that the December 31 fire originated on Mr. Davis's bed and that it was caused by the Laptop, a product manufactured by Defendant. *See supra* Sections III.A, III.B. In short, the cause of the December 31 fire—undoubtedly an essential element of Plaintiff's remaining claim—remains heavily disputed, with more than just a "mere scintilla of evidence" on either side.

The Court is not tasked with determining what *likely* caused the December 31 fire but simply whether sufficient evidence exists to permit a reasonable jury to decide that, on a more

probable than not basis, the Laptop caused the December 31 fire. Drawing all justifiable inferences in Plaintiff's favor, the Court finds that this threshold has been reached.

Accordingly, the Summary Judgment Motion is GRANTED in part, as to Plaintiff's negligence claim, and DENIED as to the remainder.

## IV.   CONCLUSION

For the reasons above, it is hereby ORDERED:

(1)   Defendant's Eskra *Daubert* Motion (Dkt. No. 47) is GRANTED in part and DENIED in part.

(2)   Defendant's Rice *Daubert* Motion (Dkt. No. 49) is GRANTED in part and DENIED in part.

(3)   Defendant's Summary Judgment Motion (Dkt. No. 45) is GRANTED in part and DENIED in part. Plaintiff's negligence claim is DISMISSED.

Dated this 5th day of September 2023.

Tana Lin
United States District Judge